UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
    vs.    )
    )    Case No. 4:09CR0299 DJS (AGF)
NATHAN MAXWELL,    )
    )
    Defendant.    )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motions filed by Defendant, Nathan

Maxwell.  Pretrial matters were referred to the undersigned United States Magistrate

Judge under 28 U.S.C. § 636(b).  Defendant filed a motion to suppress evidence and

statements.  (Doc. No. 20).  An evidentiary hearing was held on June 1, 2009.  The

government was represented by Assistant United States Attorney Jeannette S. Graviss.

Defendant was present and represented by his attorney, John D. Beger.  At the hearing,

the government presented the testimony of Deputy Sheriff Michael Manley, who is

employed with the Phelps County Sheriff's Department, and Defendant testified on his

own behalf.  The parties were given leave to file post-hearing memoranda, after which the

matter was taken under advisement.  Trial is scheduled for July 6, 2009.

Defendant's testimony of the events differed from that of the officer in several

respects.  Defendant testified that he was not any more nervous than he ever is at a traffic

stop; that the officer did not request consent to search his person, but rather simply told him he was going to pat him down, and then began to search his pockets; that he did not request consent to search his vehicle, but rather, simply told him he was doing so; and that he did not recall ever being advised of his rights under <u>Miranda</u>, until he watched the video and heard the advice of rights provided to him while he was seated in the patrol car. To the extent their testimony differs on these and other matters, the Court, having observed the witnesses and carefully reviewed the video and the testimony, credits the testimony of the officer over that of Defendant. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On the evening of December 28, 2008, Deputy Sheriff Michael Manley was on patrol. Deputy Manley has been employed with the Phelps County Sheriff's Department for approximately 2½ years, and before that served as a Reserve Officer for six to seven months. During the course of his duties, Deputy Manley estimated that he had made more than 100 traffic stops.

At approximately 11:09 p.m. that night, Deputy Manley observed a black Dodge Charger that crossed the center line on the North Outer Road, also known as the Doolittle Outer Road, along Interstate 44. At the time, he was driving alone, in his patrol car. He followed the vehicle as it turned left on County Road 8170, and then activated his lights

to curb the vehicle. The driver immediately pulled over. Deputy Manley pulled up behind the vehicle and provided dispatch with information regarding the location and license plate of the vehicle.

Deputy Manley's patrol car was fitted with a dashboard video camera, that also records audio, which he could activate manually, and which is also activated automatically with the patrol car's lights or siren. In addition, there is a microphone that the officer may wear, but Deputy Manley was not wearing the body microphone at the time of this incident. As such, while there is a video of the incident, very little of the audio can be heard. Although Defendant asserts that Deputy Manley intentionally chose not to wear the microphone so that his conversations could not be recorded, the Court makes no such finding.

Deputy Manley exited his patrol car and approached the driver. Although he did not recognize the vehicle, as he approached the driver's side window he recognized the driver as Defendant Nathan Maxwell. Defendant Maxwell and Deputy Manley were acquainted with one another, and Defendant addressed Deputy Manley by his first name. Although the extent of their relationship was not made clear at the hearing, Deputy Manley testified that he first met Defendant when they were both at a family gathering. He further testified that at some point, when Deputy Manley was serving warrants for the County, he had also previously served warrants for Defendant. From the video it is clear that they knew one another well enough to address each other by their first names. Defendant had his dog in the car with him, but there were no other passengers.

Deputy Manley asked Defendant for his license and insurance.  Defendant provided his license, but stated that the car was a rental vehicle.  At the hearing, Defendant explained that he had been driving a rental vehicle because his truck was broken and he did not have proper insurance and registration to make the truck legal.  Consistent with his normal practice, he asked Defendant to walk back to his patrol car with him, while he ran Defendant's information.  This was done for officer safety, because Deputy Manley could not know what a driver might have in the car with him, and also to eliminate making trips back and forth between the vehicles.  As they were talking, Deputy Manley noticed that Defendant was very nervous and would hardly look at him.  Deputy Manley asked Defendant if he had any weapons in the vehicle, and as he was getting out of the car, Defendant stated to him, "You know what's going on."  As they were walking from the car, Defendant continued to look around, with his eyes darting from side to side, and Deputy Manley was concerned that Defendant might attempt to flee.  He also observed a large bulge in Defendant's front left pant pocket.  Defendant's excessive nervousness, the manner in which he was looking around, and the bulge in his pocket all caused Deputy Manley to be suspicious.

As they reached the front of the patrol car, Deputy Manley asked Defendant if he could search his person for any illegal weapons or narcotics.  Defendant agreed.  No promises or threats were made to induce Defendant's consent.  Defendant at the time was 31 years old, and a high school graduate.  He did not appear to be under the influence of any drugs or alcohol.  Deputy Manley then advised Defendant he was going to pat him

down, and directed him to put his hands on the front of the patrol car. Even though Defendant had provided consent to search, Deputy Manley first conducted a pat-down because he did not know what Defendant might have in his pockets; he was not wearing gloves and he was concerned there could have been something in Defendant's pockets that could have poked or stabbed him.

Deputy Manley immediately began to pat down Defendant's front left pant pocket, where he had observed the bulge. From the pat-down, he could not determine exactly what was in the pocket. He looked askance at Defendant, and then took Defendant's left hand behind him and placed him in handcuffs. Per Defendant's own admission, Deputy Manley advised him at this time that he was not under arrest, but that he was putting cuffs on Defendant for his own protection and for Defendant's protection. At this time, Deputy Manley can also be heard saying something to Defendant about his car having crossed over the line.

Once Defendant was in handcuffs, Deputy Manley reached inside Defendant's pocket and removed the item he had felt. It was a brown paper sack, several inches tall, that contained a large amount of currency. The currency had been rolled up inside the bag, and the bag had then been rolled up inside the pocket. This was approximately 3-4 minutes after the initial stop. It was later determined to be approximately $1600 in cash.

He asked Defendant about the currency, and Defendant provided an explanation that he did not believe, perhaps related to selling a car or buying a car, or someone having owed him some money. Although the audio is very unclear, and the conversation is

interrupted in the middle by the dispatch radio, Deputy Manley can be heard saying to Defendant something like he's going to contact the IRS, and that anytime someone has a large amount of cash on them they contact the IRS. They have some further but brief conversation about the cash, and Deputy Manley can be heard saying something like, "Nobody carries that amount of cash around on him, nobody." He also appears to say something like even a guy with three million dollars doesn't carry cash in a paper bag. Pointing out the camera at the front of the car, Deputy Manley advised Defendant that he was going to lay the bag of cash on the front of the patrol car.

Deputy Manley then removed the remaining items from Defendant's left front pant pocket. While doing so they had some further conversation that is inaudible, but at one point Deputy Manley can be heard saying something like, "This makes me a little nervous. Is there anything else I need to know?" Defendant's response and their further conversation is inaudible. He also says something to Defendant like, "You're getting all jacked up because – (inaudible)." And after some comment by Defendant, Deputy Manley told Defendant that something was not right. He crossed over behind Defendant to search his right pant pocket, and advised Defendant that he was not under arrest right now. In Defendant's right pant pocket he found a bag that appeared to contain a small amount of methamphetamine. They had a bit of further conversation, that is inaudible, but at one point Deputy Manley can be heard saying, "I'm not going to be a hard ass."

After finding the methamphetamine in his pocket, Deputy Manley advised Defendant he was under arrest, and advised him of his rights under <u>Miranda</u>. They had

some further conversation, during which time Deputy Manley asked Defendant if there was anything illegal in his car. Defendant responded that there was. Deputy Manley asked Defendant if he could search the car, and Defendant gave his permission. Defendant advised him that he had narcotics in the car, that were inside a glove under the driver's side seat. They had some further conversation about the car, that was mostly inaudible, but Deputy Manley asked him if there is anything else he wanted to tell him before he went to search the car, and said if there is something to let him know. He also asked Defendant to be honest with him, and again stated that he believed that something was up. At this time, they also discussed Defendant's dog. Defendant asked Deputy Manley to take care of his dog, and to take the dog to Defendant's girlfriend's house, and Deputy Manley repeatedly assured Defendant that he would do that. This conversation took place between approximately 11:12 and 11:16 p.m., some three to seven minutes after the initial stop.

Deputy Manley then placed Defendant in the back seat of the patrol vehicle, first asking him to confirm that there was nothing else on his person. Deputy Manley then confirmed that "it" was under the driver's seat, and Defendant said "Right." He then told Defendant, "Ok, just have a seat right there, ok, Nathan? And I will make sure your stuff gets taken care of. Okay?" And Defendant responded, "Yeah."

Deputy Manley then proceeded to search Defendant's rental car. He went directly to the floor of the driver's seat, where he located a glove. Inside the glove were 3-4 baggies that contained a white crystal substance that appeared to be methamphetamine.

He also found a scale that was near the glove. He called dispatch, and then returned to his patrol car. He again advised Defendant he was under arrest, stating, "Nathan, as you know you are under arrest right now." He then re-advised Defendant of his rights under Miranda, as can be clearly heard on the video. He asked Defendant if he understood, and Defendant responded, "Yes." Defendant then asked Deputy Manley again to take care of his dog, stating, "Michael, will you please take care of my dog." He repeated that request several times. Deputy Manley said he would do that, and they discussed the location of the house to which Defendant wanted his dog to be taken.

Deputy Manley asked whether there was anything else he needed to know that was in there and whether he wanted to speak to him. Defendant responded, "I don't – about what?" In response Deputy Manley confirmed that Defendant could exercise his rights at any time and choose not to talk to him, and again confirmed that Defendant understood his rights. He also advised Defendant that he appreciated his being cooperative with him, and promised to take care of Defendant's dog.

Deputy Manley then returned to Defendant's car and continued to search inside the car. He went to the back of the car, where he believed he could smell marijuana, and opened the trunk. In what appeared to be an open box inside the trunk he found a second glove, inside of which was some marijuana. He also found a scale and a grinder. At 11:25 p.m, approximately 16 minutes after the stop began, a second officer, Corporal Lambert, arrived and assisted with the search. At no time while either he or his car was being searched, did Defendant voice any objection to the search or request that the officer

stop the search.

At approximately 11:30 p.m., Deputy Manley asked Defendant if there was anything else in the car, adding that Defendant had not let him know about the marijuana. He advised Defendant that he was under arrest for the possession of methamphetamine, marijuana, and drug paraphernalia, and that the methamphetamine was in connection with an attempt to sell. He asked Defendant how much cash there was, and Defendant responded that he was not sure. Defendant asked for a cigarette, and Deputy Manley responded that he would let him have a cigarette at the Sheriff's office, "because you have been cool with me." He asked if there was anything at the residence (presumably his girlfriend's residence) that he needed to know about, and Defendant responded, "no, sir." They had further discussion about where Defendant was living, and discussed in detail how to find the house where Defendant wanted his dog to be taken.

The officers had arranged for a tow truck, which arrived shortly thereafter. Small bits of the conversation between the two officers while they are waiting for the tow truck can be heard on the video. At one point one mentions a price of $100 per gram. Deputy Manley also appears to say, "I can get him to talk. I know I can." A few minutes later he can be heard telling the other officer, "I thought he was going to run."

A few minutes later, at 11:41 p.m., Deputy Manley loosened Defendant's handcuffs at Defendant's request. They had some further discussion regarding Defendant's dog, and Defendant thanked him for taking care of his dog.

Deputy Manley and the other officer, still waiting for the tow truck, had some

further conversation. Although the conversation is mostly inaudible, they appear to be discussing some larger investigation. One of them, perhaps Deputy Manley, says something like, "I know where it's coming from and there's a lot more over there. I've only been working on this for about a week. I've been waiting on this and I just got it." He also appears to say something like, "I know it's coming from there. . . . He's pretty cooperative. Acts like he want to do something. I asked him – (inaudible)." He also appears to have some discussion about getting a search warrant, and perhaps some question about whether he has enough. During part of this discussion, Deputy Manley is speaking on his cell phone.

The tow truck arrived at approximately 11:44 p.m. They removed Defendant's dog from his car, and Cpl. Lambert took the dog to the place Defendant had requested. Deputy Manley advised Defendant they were taking his dog to the place he had requested, noting that Defendant had been cooperative with him.

Defendant's rental car was towed, and Defendant was transported to the station. At the station, Deputy Manley and Detective Davis took Defendant to an interview room. His handcuffs were removed, he was seated in a chair, and he was given a soda and a cigarette. Prior to any questioning, Defendant was again advised of his rights under Miranda. Defendant provided an oral statement, stating that he had purchased the methamphetamine from a gentleman in the Doolittle area in the Cooking From Scratch parking lot. When asked about the cash, he stated that it was from an ounce of methamphetamine that he had just sold. No promises or threats were made to induce

Defendant's statements.

The crystal substance that was seized was field tested. It tested positive for methamphetamine, and had a weight of approximately 80 grams. The other substance tested positive for marijuana, with a weight of approximately 30 grams. The currency that was seized totaled $1,590. Def. Ex. C.

## CONCLUSIONS OF LAW

Defendant challenges the pat-down and search of his person, asserting that Deputy Manley did not have consent to conduct a search of Defendant, did not have reasonable suspicion to support a pat-down, and that he violated the "plain feel" doctrine. As such, Defendant asserts that all physical evidence seized after this excessive Terry stop, as well as all statements made by Defendant, should be suppressed. Defendant further asserts that any statements made by him should be suppressed because he was placed under arrest after the methamphetamine was discovered in this pocket, and was thereafter questioned without being advised of his Miranda rights.

### A. **Validity and Scope of the Stop**

The law is clear that when a police officer observes a traffic violation – however minor – he has probable cause to stop the vehicle. Whren v. United States, 517 U.S. 806, 818 (1996); United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005). "This is true even if a valid traffic stop is a pretext for other investigation." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002). Here, Deputy Manley personally observed a traffic

offense committed by Defendant, and as such, had probable cause to stop the car.

Once an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (quoting United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990)). "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." Id.; United States v. Jones, 269 F.3d 919, 924-25 (8th Cir. 2001). Deputy Manley was therefore justified in requesting Defendant's license and registration, inquiring about the ownership of the car, and in requesting him to step out of the car and go to his patrol car. Arizona v. Johnson, __ U.S. __, 129 S.Ct. 781, 786 (2009); United States v. Pulliam, 265 F.3d 736, 740 (8th Cir. 2001); United States v. Winters, 221 F.3d 1039, 1041 (8th Cir. 2000). Deputy Manley was also authorized to inquire if Defendant had any weapons in the car. See Arizona v. Johnson, 129 S.Ct. at 788.

The law is also clear that when "'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995) (quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993)). Police officers may briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). The reasonable belief requires suspicion based on

"'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)).  While reasonable suspicion requires "more than an inchoate 'hunch,' the Fourth Amendment only requires that the police articulate some minimal, objective justification for an investigatory stop." United States v. Walker, 555 F.3d 716, 719 (8th Cir. 2009) (quoting United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004)).

When an officer develops reasonable, articulable suspicion of criminal activity during a traffic stop, he is justified in making a greater intrusion unrelated to the traffic offense.  United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995); Bloomfield, 40 F.3d at 918.  Officers are "permitted 'to graduate their responses to the demands of the particular situation.'"  Pereira-Munoz, at 791 (quoting United States v. Place, 462 U.S. 696, 710 n.10 (1983)).  The reasonable suspicion is assessed in light of the totality of the circumstances, taking into consideration the officers' experience.  Id.

> The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. . . .  [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

Florida v. Royer, 460 U.S. 491, 500 (1983).  See Bloomfield at 916; United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992).

Here, the officer had reasonable suspicion to expand the scope of the stop to request consent to search, based on Defendant's conduct.  Defendant was driving a rental car, and was exceedingly nervous, not looking at the officer and barely speaking to him, even though Defendant plainly knew the officer well enough to address him by his first name.  Defendant also made a cryptic comment, stating, "You know what's going on." Both while he was in the car, and after he exited and was walking to the patrol car, Defendant was looking around in a manner that caused the officer to have concern that he might try to flee.[1]  Moreover, he observed a large bulge in Defendant's pocket.

In light of these facts, it was reasonable for the officer detain Defendant for the time required to request consent to search.  In this regard, the Court notes that only 2-3 minutes had passed, and the officer had not yet had enough time to run a check of Defendant's information or write a ticket.  See United States v. Blaylock, 421 F.3d 758, 769 (8th Cir. 2005) (passenger's extreme nervousness, combined with presence of masking odors, contradictory statements, and driver's vague reasons for trip, provided reasonable cause to detain vehicle for canine search), cert. denied, 546 U.S. 1126 (2006); accord United States v. Sanchez, 417 F.3d 971, 975-76 (8th Cir. 2005); United States v. Poulack, 236 F.3d 932, 935-6 (8th Cir. 2001); United States v. Lyton, 161 F.3d 1168, 1170-71 (8th Cir. 1998).  In any event, the Supreme Court has made plain that an officer

---

[1] The Court further notes that where, as here, an officer personally knows the suspect, and yet the suspect acts as though he might try to flee, it is reasonable to assume the suspect might have contraband on his person, which he hopes to conceal.

does not exceed the scope of a traffic stop by requesting consent to search.

> The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally the stop ends when the police have no further need to control the scene and inform the driver and passengers they are free to leave. . . . An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. . . .

Arizona v. Johnson, 129 S.Ct. at 788 (citations omitted); accord United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007) (holding that officer did not effect an unreasonable seizure "by asking three brief questions related to possible drug trafficking amidst his other traffic-related inquiries and tasks") United States v. Yang, 345 F.3d 650, 654 (8th Cir. 2003) ("the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances").

### B. Pat-Down and Search of Defendant

Where the validity of the search rests on consent, the government has the burden to prove the consent was voluntarily given. In the context of a warrantless search, it is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given. Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. White, 81 F.3d 775, 780 (8th Cir. 1996); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994). The consent, however, need not necessarily be knowing and intelligent. Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973). One need not be aware of his or

her right to consent in order to make the consent voluntary.  United States v. Chaidez,

906 F.2d 377, 380 (8th Cir. 1990).

A consent is voluntary if it is the product of free choice, the defendant's will is not

overborne, and the consent is not given under coercion or duress.  In determining whether

the prosecution has met its burden, courts look to both the characteristics of the accused

and the details of the environment in which the consent was given.  Chaidez, 906 F.2d at

381.  Voluntariness is a fact question to be determined from the totality of the

circumstances present.  Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415

U.S. 164 (1964).  The factors to be considered in determining whether consent is

voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and
> education; (3) whether the defendant was under the influence of drugs or
> alcohol; (4) whether the defendant was informed of his Miranda rights
> prior to the consent; and (5) whether the defendant had experienced prior
> arrests so that he was aware of the protections the legal system affords to
> suspected criminals.

United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001); accord United States v.

Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381.  Among the

factors to be considered in examining the environment surrounding the consent, courts

examine:  the length of time a person is detained and questioned; whether the person was

threatened, physically intimidated, or punished by the police; whether the defendant

relied upon promises or misrepresentations made by the police; whether the defendant

was in custody; whether the consent occurred in a public or secluded location; and

whether the defendant objected to the search or stood silently by while the search occurred. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, at 381.

Defendant was 31 years old, had graduated high school, and was working as an HVACR technician. At the time consent was requested, the stop had lasted no more than two minutes, there had been no investigative questioning, and no promises or threats were made to induce his consent. Defendant did not appear to be under the influence of drugs or alcohol and at the time he provided consent, he was not under arrest, nor was he in handcuffs.[2] Based on the totality of the circumstances, the Court finds that Defendant's consent was voluntary.

On these facts, however, Deputy Manley would have been justified in conducting a pat-down search in any event. During a traffic stop, an officer may frisk a suspect to protect himself and preserve the status quo, if he has "a reasonable, articulable suspicion" the individual may be armed and dangerous. See Arizona v. Johnson, 129 S.Ct. at 784; United States v. Banks, 553 F.3d 1101, 1105 (8th Cir. 2009); United States v. Oliver, 550 F.3d 734, 737-38 (8th Cir. 2008). "Under this objective test the 'officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent

---

[2] At the hearing, Deputy Manley originally stated his belief that Defendant was already in handcuffs at the time he requested consent to search, but when he reviewed the video during cross-examination, he determined that he had not yet placed Defendant in handcuffs when he requested consent to search.

man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" Banks, 553 F.3d at 1105 (quoting Terry, 392 U.S. at 27); see also Walker, 555 F.3d at 721 (holding that during a Terry stop, officers are permitted to check for weapons and to take any additional steps reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop). Such protective searches allow for the use of handcuffs. Id.

Here, notwithstanding that he knew the officer, Defendant was excessively nervous, was looking around, and would not make eye contact. There was also a large bulge in his front pocket. Given that the officer was alone with Defendant, on a dark street, late at night, he would have been justified in conducting a pat-down search, even if Defendant had not consented to the search. See Banks, 553 F.3d at 1105-06 (holding that officer had justification for pat-down during Terry stop, where defendant shrugged when asked if there was anything in his pockets that would hurt the officer, and defendant was riding a bicycle in a deserted area late at night) (citing United States v. Menard, 95 F.3d 9, 11-12 (8th Cir. 1996) (stating that late-night encounters on deserted roads tend to support the necessity for pat-down searches for offer safety)); Oliver, 550 F.3d at 738-39 (holding that officer was justified in conducting pat-down search during course of traffic stop, late at night, where vehicle failed initially to stop, driver threw keys on roof, defendant's hands were shaking and he was fidgeting with front pocket of hooded sweatshirt).

Although unnecessary to the analysis, given Defendant's consent to search, the Court also rejects Defendant's assertion that the officer exceeded the scope of the pat-

down.  Defendant is correct that a protective pat-down must be limited in scope to a search for weapons, and may not be used to search for evidence of criminal activities after concluding no weapons are present.  See United States v. Hanlon, 401 F.3d 926, 930 (8th Cir. 2005).  Further, under the "plain feel doctrine," an officer may not manipulate an item to determine if it may be contraband after determining that the item is not a weapon.  See Minnesota v. Dickerson, 508 U.S. 366, 378-79 (1993).  However, here what the officer felt was large and hard;  he was not certain what it was, and could not rule out a weapon. Under these circumstances the case law recognizes that the officer may proceed further to allay his concerns.  See United States v. Majors, 328 F.3d 791, 795 (5th Cir. 2003) (holding that officer was justified in continuing search for his own protection where object was "bigger than a softball" and "in between hard and soft," and he could not rule out the possibility that the bulge in his pocket was a weapon); United States v. Campbell, 178 F.3d 345, 349 (5th Cir. 1999) (holding that officer who had not ruled out possibility that large bulge was a weapon did not exceed the scope of a permissible Terry frisk by removing the item from the suspect's pocket).

Even if one accepts Defendant's assertion that the officer must have been able to determine that the item was, in fact, a large amount of cash, under these facts the officer would have been reasonable in seizing what appeared to be a large quantity of cash.  In United States v. Bustos-Torres, 396 F.3d 935, 944-45 (8th Cir. 2005), the Court recognized that an officer conducting a lawful pat-down search may seize items which he has probable cause to believe may be incriminating evidence.  In that case, where drug

dealing was suspected, the Court found that the officer was justified in seizing what would have been a collection of approximately 40 bills in one pocket.  <u>Id.</u> at 945.  From the videotape, it appears that the number of bills here was just as large.  Thus, even if one accepted Defendant's assertion that the officer had to know that the item was a large wad of bills, on these facts the officer had probable cause to retrieve the wad of cash.  After locating the cash, the officer's suspicions were not dispelled, as he did not find Defendant's explanation of the cash, under the circumstances, to be credible.

### C.  <u>Consent to Search the Car</u>

Defendant asserts that he did not provide consent to search his car.  He also contends that any statements made by Defendant after the methamphetamine was found in his pocket must be suppressed because Defendant was not advised of his <u>Miranda</u> rights.  Based on this Court's assessment of the conflicting testimony, however, the Court finds that Defendant did, in fact, consent to a search of his car.  While this portion of the video is inaudible, the portions that are audible further support this finding.  Moreover, even if Defendant had not been advised of his rights under <u>Miranda</u> prior to requesting consent, that would not mandate a suppression of the evidence found.  Whether Defendant was advised of his rights under <u>Miranda</u> prior to seeking consent is simply one factor to be considered; the question is whether based on all of the factors, the consent was voluntary. Here the Court finds that it was.

On this record there is nothing to suggest that Defendant's will was overborne. <u>Poulack</u>, 236 F.3d at 936; <u>Miller</u>, 20 F.3d at 930.  As stated above, at the time Defendant

was an adult, who was not under the influence of any drugs or narcotics, appeared to understand what was being said, and provided responsive answers. There was only one officer present and it was an officer Defendant knew well enough to address by the officer's first name. Only a few minutes had passed from the time of the stop until consent was given, no threats or promises were made to induce the consent, and the officer did not display his firearm or do anything to force Defendant to consent. To the contrary, the officer appears to do nothing more than tell Defendant that he does not believe the story Defendant is telling him, suggest he is getting himself "all jacked up" unnecessarily, and ask Defendant to be honest with him.

Even if one assumes, arguendo, that Deputy Manley did not advise Defendant of his Miranda rights at this time, such advice is not required for a valid consent to search. United States v. Vera, 457 F.3d 831, 835 (8th Cir. 2006) (recognizing there is no requirement that officer inform citizen of right to refuse consent, and no presumption that consent is invalid where given without explicit notification of right to refuse to consent), cert. denied, 549 U.S. 1230 (2007); United States v. Montano-Gudino, 309 F.3d 501, 504 (8th Cir. 2002) (same); United States v. Payne, 119 F.3d 637, 643-44 (8th Cir. 1997) ("We have never held that a request to search must be preceded by Miranda warnings or that a lack of Miranda warnings invalidates a consent to search."). Nor is his consent rendered involuntary by the failure to have Defendant sign a consent to search form. See United States v. Siwek, 453 F.3d 1079, 1084 (8th Cir. 2006) (citing cases). And at no time did Defendant ask that the search be discontinued. See United States v. Saenz, 474 F.3d 1132,

1137 (8th Cir. 2007) (finding consent to search voluntary, though no <u>Miranda</u> warnings given, where officers' request to move truck to safer area with less traffic was not coercive, officers did not make threats or promises or suggest defendant could not refuse consent, detention was for brief period of time, and defendant was silent during search). Based on the totality of the circumstances, the Court concludes that Defendant voluntarily consented to a search of the vehicle. <u>See</u> <u>Montano-Gudino</u>, 309 F.3d at 504; <u>White</u>, 81 F.3d at 780.

Further, the officer did not need consent to justify a search of the car. Here, Defendant was excessively nervous, was driving a rental car, had $1,600 in cash rolled up in his pocket, and a small amount of methamphetamine on his person. On these facts, Deputy Manley had probable cause to search the vehicle, with or without consent. <u>See</u> <u>United States v. Barnum</u>, 564 F.3d 964, 970 (8th Cir. 2009) (holding that after the defendant "voluntarily consented to the search of his person, which revealed a crack pipe and $305 in cash" . . . and placed the defendant under arrest, the officer "could have searched [defendant's] rental vehicle, without his consent, for further evidence relevant to the drug offense for which [the defendant] had been arrested").

### D.  <u>Statements Made at the Time of the Stop</u>

Defendant seeks to suppress the statements made by him at the scene, on the ground that they were the result of an unlawful <u>Terry</u> stop, an unlawful search, and because Defendant was not advised of his <u>Miranda</u> rights. The Court rejects Defendant's first two contentions, having found the stop, detention, and search of Defendant's person

all to have been valid.  The Court also rejects Defendant's third argument, having found, from a factual standpoint, that Defendant was advised of his rights following his arrest.

It is unclear whether Defendant is asserting that the officer was obligated to advise Defendant of his rights prior to formally placing him under arrest.  The Supreme Court has recognized that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda."  Berkemer v. McCarty, 468 U.S. 420, 440 (1984).  However,  "'most Terry stops do not trigger the detainee's Miranda rights.'"  United States v. Martinez, 462 F.3d 903, 909 (8th Cir. 2006), cert. denied, 549 U.S. 1272 (2007) (quoting United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003)).

On these particular facts, the officer was not required to advise the Defendant of his rights under Miranda prior to his formal arrest.  All of the questioning pertained to the stop or was directly related to the officer's reasonable suspicions.  The questioning took place over just a few minutes, and was no longer than was necessary to address the officer's suspicions.  And although Defendant was placed in handcuffs while his pockets were searched, even Defendant admits that he was specifically advised -- by this officer whom he knew personally -- that he was not under arrest and that he was being placed in cuffs simply for their own safety.  Immediately prior to searching Defendant's right pocket, where the smaller amount of methamphetamine was found, Defendant was advised again that he was not under arrest.  As such, under the totality of the circumstances, the Court

finds that Defendant was not in custody for purposes of <u>Miranda</u>, and his statements made prior to his formal arrest are not subject to suppression.  <u>See</u> <u>Pelayo-Ruelas</u>, 345 F.3d at 593 (holding that where defendant was removed from car and patted down in connection with drug investigation, <u>Miranda</u> warnings were not required and statements were not subject to suppression, where only one agent approached and questioned defendant, agent was in plain clothes and did not draw weapon, atmosphere was like typical traffic stop, and investigation was reasonably limited to confirming or dispelling suspicions).

After the officer found the methamphetamine in Defendant's pocket, he placed Defendant under arrest and advised him of his rights under <u>Miranda</u>.  A defendant may knowingly and intelligently waive his rights and agree to answer questions.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of <u>Miranda</u> rights by the defendant.  <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it.  <u>Moran v. Burbine</u>, 475 U.S. 412 (1986).  The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne.  <u>Connelly</u>, 479 U.S. at 170;  <u>Haynes v. Washington</u>, 373 U.S. 503 (1963).  "The

requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness inquiry." <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of <u>Miranda</u>, are rare." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 433 n.20 (1984). <u>See Dickerson</u>, 530 U.S. at 444.

The full extent of any statements made by Defendant at the scene was not detailed at the hearing, but Defendant seeks to suppress his statement that there was methamphetamine in the car, and where it was located. Although Defendant was plainly under arrest at this time, neither his waiver of rights and nor his statements were based on any threats, force, or misstatements. Defendant acknowledged that he understood his rights, and does not now contend otherwise. As set forth above, he is an adult with a high school education, and was not in any way impaired. From the video it is apparent that Defendant is conversing easily with the officer, and is cooperative. Indeed, Defendant's main concern appears to be that his dog be taken care of, which Deputy Manley repeatedly assures Defendant he will do. And the bulk of the discussion between Deputy Manley and Defendant appears to be about Defendant's dog, and not about any potentially incriminating matters. Based on all the circumstances, the Court finds Defendant's statements at the scene were voluntary and are not subject to suppression.

### E. Statements at the Station, and Alleged Delay in Advice of Rights

Finally, the Court will address the statements made at the station, and Defendant's

arguments regarding the alleged delay in advising Defendant of his <u>Miranda</u> rights.

Defendant asserts (contrary to this Court's factual finding) that although Defendant was placed under arrest immediately after the methamphetamine was located in his pant pocket, he was not advised of his rights until after the search of his car, when such advice can be heard on the video. As such, Defendant asserts that his statements at the scene advising the officer of the existence and location of the methamphetamine in the car, should be suppressed. He further asserts that any items seized from the car must be suppressed -- presumably as the fruit of the suppressed statements. Finally, he claims that because the officer obtained a confession (presumably regarding the fact that methamphetamine was contained in the car) before being advised of his rights, his later "repeat" confession at the station should be suppressed as well, under <u>Missouri v. Seibert</u>, 542 U.S. 600 (2003). The Court finds no merit to Defendant's arguments.

First, although one of Deputy Manley's responses in cross-examination is admittedly vague, the Court found Deputy Manley's testimony to be credible, and understood his testimony to be that he advised Defendant of his rights when he first placed him under arrest after finding the methamphetamine in his pocket. Thus, Defendant's arguments fail on the facts.

Moreover, even if Deputy Manley had delayed advising Defendant of his rights until after the search of his vehicle, it does not follow that the items found in the car would be subject to suppression. This is so for two independent reasons. First, as discussed above, even if Defendant had not been advised of his <u>Miranda</u> rights prior to giving

consent to search the car, the Court still would find Defendant's consent to be voluntary.

Second, the suppression of Defendant's inculpatory statements at the scene, following his

arrest, would not negate the probable cause that already existed to search the car, based on

Defendant's conduct and the cash and methamphetamine found in his pockets. In this

regard, the Court notes that Defendant does not assert that Deputy Manley would have

been unable to find the methamphetamine absent Defendant's statements, and the record

would not support such an assertion. Indeed, Deputy Manley located the marijuana and

other items found in the trunk, notwithstanding that Defendant made no mention of these

items. See Olivera-Mendez, 484 F.3d at 511 ("holding that "evidence should not be

excluded from trial based on a constitutional violation unless the illegality is at least a but-

for cause of obtaining the evidence"); United States v. Martinez, 462 F.3d 903, 910 (8th

Cir. 2006) (holding that neither seized cash nor later identification were subject to

suppression as they were not a result of statements made in violation of Miranda).

Nor would the purported delay in advising Defendant of his rights at the scene

require the suppression of the statements made at the station. As limited by Justice

Kennedy's concurrence, the Eighth Circuit has recognized that Seibert applies only to the

type of "staged" or "two-step" interrogations in which officers deliberately delay advising

a defendant of his rights in order to elicit an initial confession, to be followed by a repeat

of the confession following an advice of rights. See United States v. Walker, 518 F.3d

983, 985 (8th Cir. 2008); United States v. Ollie, 442 F.3d 1135, 1141-42 (8th Cir. 2006).

"Seibert requires that a court determine whether an officer's interrogation technique was a

'designed,' 'deliberate,' or 'calculated' circumvention of <u>Miranda</u>." <u>United States v.</u> <u>Elzahabi</u>, 557 F.3d 879, 884 (8th Cir.), <u>cert. denied</u>, __ U.S. __, 2009 WL 1248244 (2009); <u>accord</u> <u>United States v. Torres-Lona</u>, 491 F.3d 750, 757 (8th Cir. 2007), <u>cert.</u> <u>denied</u>, 128 S.Ct. 927 (2008). "Where a defendant alleges that his post Miranda statement was obtained in the course of a two part interrogation, the prosecution bears the burden of establishing by a preponderance of the evidence that the failure to provide warnings at the outset of interrogation was not deliberate." <u>Torres-Lona</u>, 491 F.3d at 758 (citing <u>Ollie</u>, 442 F.3d at 1142-43).

Although the government does not address this argument, the Court finds that any failure to provide warnings at the outset of any custodial interrogation at the scene was not deliberate. Rather, the interaction began as a <u>Terry</u> stop, in which Defendant was cooperating with the officer, and was reasonably expanded as a result of Defendant's own conduct and the items discovered through a consensual search. If, in fact, Deputy Manley first advised Defendant of his rights following the car search, when Defendant was seated in the patrol car, any delay was not deliberate. <u>See</u> <u>Walker</u>, 518 F.3d at 985 (finding no improper tactic under <u>Seibert</u> where the defendant, who was arrested for firearms, identified marijuana as his, in violation of <u>Miranda</u>, and was questioned next day regarding firearms and marijuana, after advice of rights); <u>Torres-Lona</u>, 491 F.3d at 758 (finding failure to warn not deliberate where immigration agent did not believe warning was necessary).

As such, even if the Court adopted Defendant's version of the facts regarding the

timing of the <u>Miranda</u> warnings, the case would be governed not by <u>Seibert</u>, but by

<u>Oregon v. Elstad</u>, 470 U.S. 298 (1985). <u>See</u> <u>Walker</u>, 518 F.3d at 985 (holding that where

"improper tactic was not employed and the two questioning sessions were separated by

time and location, [the] case is governed by <u>Elstad</u>, not <u>Seibert</u>"); <u>Torres-Lona</u>, 491 F.3d

at 758 (same). In <u>Elstad</u> the Court recognized that no purpose would be served by

imputing a "taint" from an earlier <u>Miranda</u> violation to subsequent statements made after a

proper advice of rights and a voluntary and knowing waiver of rights. <u>Elstad</u>, 470 U.S. at

318. Where, as here, the initial statements were voluntary, the proper inquiry is whether,

in fact, Defendant's statements following a proper advice of rights were voluntary. <u>Id.</u>

"As in any such inquiry, the finder of fact must examine the surrounding circumstances

and the entire course of police conduct with respect to the suspect in evaluating the

voluntariness of his statements." <u>Id.</u>

Here, very little questioning took place between the time of Defendant's arrest and

when he was advised of his rights in the patrol car, and Defendant was not in any manner

coerced into making his statements of at the scene. While approximately five minutes

passed from the time of the arrest until Defendant contends he was first advised of his

rights,[3] most of that time was spent with Defendant seated alone in the patrol car while the

officer searched Defendant's car and waited for backup. And the bulk of the conversation

---

[3] Defendant was arrested at approximately 11:13 p.m., and Deputy Manley can be heard advising Defendant of the violations for which he is under arrest and advising him of his right at 11:18 p.m.

pertained to Defendant's dog and identifying the place where Defendant wanted his dog to be taken. After formally advising Defendant of his rights, Deputy Manley again confirmed that Defendant understood both his rights and that he (Defendant) was not required to speak to him, stating, "At any time you can exercise your rights and not speak to me." Defendant was then taken to the station, and advised of his rights yet again.[4] Defendant again stated that he understood his rights, and agreed to make a statement.

The two statements were made at different locations, with some passage of time in between, and while one of the questioning officers was the arresting officer, the other was not. Moreover, the focus of the questioning at the station was different and broader. The interview at the station was conducted by only two officers, in an interview room. Defendant was not restrained in any fashion, and had been given a soda and a cigarette. As set forth above, Defendant is an adult who did not appear to be under the influence of any drugs or alcohol, or to be impaired in any other manner. No promises or threats were made to induce Defendant's waiver or his oral statements at the station. Based on the totality of the circumstances, the Court finds Defendant knowingly and voluntarily waived his rights and made a voluntary oral statement. As such, even if this Court were to assume that a <u>Miranda</u> violation resulted from a delayed advice of rights at the scene, Defendant's statements at the station still would not be subject to suppression. <u>See Walker</u>, 518 F.3d at

---

[4] In this regard, the Court notes that having advised Defendant of his rights at the scene, there was no requirement that he be re-advised of his rights prior to questioning at the station a bit later that day.

985-86 (holding statements made at station, after advice of rights, were not subject to suppression notwithstanding that the officers elicited a confession from the defendant at the time of his arrest, in violation of <u>Miranda</u>, that the marijuana observed at the scene was his and that he smokes it); <u>see also</u> <u>Torres-Lona</u>, 491 F.3d at 758.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Physical Evidence and Statements [Doc. No. 20] be **Denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 18th day of June, 2009.